**FILED**

JUL 2 8 2016

Clerk, U.S. District Court
Texas Eastern

IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **Albert Lynn Barcroft**<br>Plaintiff<br>4344 East 1950 Road<br>Fort Towson, Oklahoma 74735<br>Phone: 903-422-1992<br>E-mail Address: albertbarcroft@gmail.com<br><br>V.<br><br>**KENNETH VERN GIBBS,**<br>Defendant<br>4212 Wheeler Drive<br>Fort Worth, Texas 76117<br>Phone: 817-564-3411<br>(and)<br>**CANDACE GIBBS WALTON,**<br>Defendant<br>500 Logan Drive<br>Azle, Texas 76020<br>Phone: 817-688-1042<br>E-mail Address: candywalton1@yahoo.com<br>(and)<br>**CHRISTY L. LEE,**<br>Defendant<br>225 East Fireweed Lane, Suite 200<br>Anchorage, Alaska 99503; or,<br>777 Main Street, Suite 600<br>Fort Worth, Texas 76102.<br>Phone number in Alaska: 907-339-9931<br>Phone number in Texas is 817-504-6075<br>E-mail address: clee@christyleelaw.com<br>(and)<br>**PATRICK W. FERCHILL,**<br>Defendant<br>100 E. Weatherford St. Rm 150<br>Fort Worth, Texas 76102.<br>Phone number: 817-884-1415<br>E-mail address is PWFerchill@TarrantCounty.com. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Suit to Compel<br>Performance of a Contract<br><br>28 U.S.C. § 1332, Diversity of<br>Citizenship; and,<br>28 U.S.C. § 1331, Federal Question<br><br><br>Case No. 4:16cv562<br><br><br>Jury Trial Requested<br><br>Mazzant/Nowak |

**TO THE HONORABLE COURT:**

<u>**ORIGINAL COMPLAINT**</u>

I, **Albert Lynn Barcroft**, Plaintiff, herein also "Barcroft", bring this action for cause against **Kenneth Vern Gibbs**, herein also "Gibbs", **Candace Gibbs Walton**, herein also "Walton", **Christy L. Lee**, herein also "Lee", and **Patrick W. Ferchill**, herein also "Ferchill", to compel compliance under a contract, to enforce *due process* and Article I, Section 10 of the Constitution of the United States with respect to contracts; also, a demand of trial by Jury is hereby made; and, would show the honorable court as follows:

## I.     PARTIES

1.     Plaintiff, Albert Lynn Barcroft lives in the State of Oklahoma at 4344 East 1950 Road, Fort Towson, Oklahoma 74735. Barcroft's e-mail is albertbarcroft@gmail.com, and his phone number is 903-422-1992.

2.     Kenneth Vern Gibbs, Defendant, is a resident of Tarrant County, Texas. His home address is 4212 Wheeler Drive, Fort Worth, Texas 76117.  Gibbs' phone number is 817-564-3411. Gibbs' e-mail address number is unknown to Barcroft.

3.     Candace Gibbs Walton, Defendant, is a resident of Tarrant County, Texas. Her address is 500 Logan Drive, Azle, Texas 76020; and, her e-mail address is candywalton1@yahoo.com. Walton's phone number is 817-688-1042.

4.     Christy L. Lee, Defendant, is a resident of the State of Alaska and an attorney licensed to practice law in both the State of Alaska and the State of Texas, Texas Bar Card Number 24052302. Lee can be served at either of her business addresses, 225 East Fireweed Lane, Suite

200, Anchorage, Alaska 99503; or, 777 Main Street, Suite 600, Fort Worth, Texas 76102. Lee's phone number in Alaska is 907-339-9931. Lee's phone number in Texas is 817-504-6075. Lee's e-mail address is clee@christyleelaw.com.

5.      Patrick W. Ferchill, Defendant, is a resident of the State of Texas; and, is the judge of Statutory Probate Court Number 2 of Tarrant County, Texas. Ferchill's business address is 100 E. Weatherford Street, Room 150, Fort Worth, Texas 76102. Ferchill's phone number is 817-884-1415. Ferchill's e-mail address is PWFerchill@TarrantCounty.com.

## II.      JURISDICTION AND VENUE

**Jurisdiction:**

6.      This court has jurisdiction over the instant matter because the amount in controversy exceeds $75,000.00 pursuant to 28 U.S.C. § 1332 (a); and, because there is diversity of citizenship pursuant to 28 U.S.C. § 1332 (a)(1) as a matter between citizens of different states. This court has personal jurisdiction over the defendants because Plaintiff's residence is in the State of Oklahoma, three of the defendants reside in the State of Texas and the fourth defendant resides in the State of Alaska; and, the situs of the contract under which the matter arose, and a substantial part of the events or omissions giving rise to the claim, are in Fannin County, Texas.

7.      This Court also has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States *i.e.* a "*federal question*". Article I, Section 10 of the Constitution states, in relevant part, "No State shall … pass any… Law impairing the Obligation of Contracts, …"; and, all persons are guaranteed *due process* under the Constitution. This case involves laws of the State of Texas which are being used to impair the obligations of a contract.

In addition, Barcroft has been denied *due process* because the Statutory Probate Court No. 2 of Tarrant County, Texas, *i.e.* Judge Patrick W. Ferchill, failed to follow *rule of law*. The denial of *due process* in state court also raises an issue sufficient to give this court jurisdiction as a *federal question*.

**Venue:**

8.      This court has venue over the instant matter pursuant to 28 U.S.C. § 1391 (b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in Fannin County, Texas[1]; and Fannin County, Texas, is within the jurisdictional authority of the Eastern District of Texas; and, pursuant to 28 U.S.C. 1391(c)(1) as Barcroft is domiciled in the State of Oklahoma, three of the defendants reside in the State of Texas and the fourth defendant resides in the State of Alaska.

### III.    STATEMENT OF THE CASE

9.      This case originates from a contract (hereinafter "Contract") between four (4) parties, three on one side and one on the other, copy of which is attached as Exhibit "A" hereto, and incorporated herein for all purposes.  This is purely a four corners of the contract case that defendants have attempted to impair using laws of the State of Texas to circumvent and impair the terms of the Contract. The Contract was for the sale of certain property belonging to, or that might later belong to, Kenneth Vern Gibbs, Candace Gibbs Walton, and Howard Kirk Gibbs, collectively also "the three heirs", to Albert Lynn Barcroft in exchange for a payment of Silver

---

[1] The Contract, which is the only nexus between the parties and upon which all claims in this suit are based resides in Fannin County, Texas; and, contains a clause for mandatory venue in Fannin County, Texas, for all disputes. The situs of the GWB Trust was in Fannin County, Texas at the time the disputes concerning it arose; and, all acts complained of in related suits by some of the defendants allegedly occurred in Fannin County, Texas. Fannin County is in the jurisdiction of this court, the Federal Eastern District of Texas.

Coins in the form of United States Silver Dollars, receipt of which is acknowledged in the

Contract; and, for Barcroft's labor and financing of an effort to retrieve two lost estates.

10.     The purpose of the Contract was fulfilled and the estates recovered, the parties lived in

relative peace for several years, each believing the others were acting in an honorable fashion to

fulfill their obligations under the Contract. A dispute erupted between the parties over the sale of

land belonging to the estate. The amicable relationship between the parties was replaced with

threats and accusations. Both sides employed attorneys, a dispute in which the assets from the

estate were frozen to some of the parties to the Contract, and lawsuits were filed.

11.     This case arises from the fact that lawsuits were filed in the wrong jurisdiction and venue,

and laws of the State of Texas were misused in an attempt to deprive Barcroft of his rights under

the Contract; thereby, using such laws of the State of Texas to impair the obligations of the

Contract, a violation under Article I, Section 10 of the Constitution.

12.     The recovered estates contained a large amount of valuable real estate that was to be

immediately sold and the proceeds distributed under the terms of both the Contract and the

Family Settlement Agreement[2], herein also "FSA", wherein the correct percentage of the

ownership of the estates was settled; however, Gibbs became the executor of the estate and

Administrator of the FSA, and refused to sell the property. Barcroft, along with the other heir,

Howard Kirk Gibbs ("Howard"), insisted that the land be sold and the proceeds distributed.

---

[2] The Family Settlement Agreement was negotiated between the four heirs to the estates of Bert Hughes Gibbs and Kathryn Houseworth Gibbs, and set forth the terms and conditions for the proper disbursement of both estates. It was agreed that the FSA would be the ruling document for both estates, and that normal probate would not apply to either estate; and, all parties to the contract signed the FSA. The FSA constituted a major transaction under Texas law, and mandatory venue for any disputes was agreed to be in Denton County, Texas. Plaintiff was an original signer of the FSA.

13.    Defendants Gibbs and Walton hired Lee as their attorney. Lee immediately became a full player in the saga, and stated making decisions for her clients that were in her best interests, not her clients' best interests. Lee engineered and set up a conspiracy between herself, Gibbs, Walton and Ferchill wherein she was able to commandeer all the legal proceedings and force those proceedings into the Statutory Probate Court No. 2 of Tarrant County, Texas, herein also "Ferchill's Court", a court which had no jurisdiction or venue to hear a contract case under the State of Texas rules, regulations and laws. By channeling everything through Ferchill, Lee assured herself and her clients of nothing but favorable rulings and orders.

14.    Lawsuits ensued, a battle over venue and jurisdiction presented itself, and Ferchill declined to follow *rule of law* in virtually every decision from the bench. This suit is to ensure compliance with a written contract and the Constitution; and to enforce the right of *due process*.

## IV.    STATEMENT OF FACTS

15.    Sometime in October of 2004, Howard contacted Barcroft concerning the estate of Bert Hughes Gibbs, his, Gibbs and Walton's natural father. The fourth sibling, Kip Hughes Gibbs ("Kip"), had pulled a shrewd legal move and managed to gain control of the entire estates of both their father and mother.  The three heirs had been effectively totally cut out of their father's and mother's sizable estates. A final court order more than 60 days old, therefore not appealable, was in place assuring that the three heirs would receive virtually nothing; and, a judgment of over a million dollars including interest had been granted and finalized in favor of Kip, as next friend to his mother, against the three heirs and their father Bert Hughes Gibbs, collectively and individually, and filed in the public record of Denton County, Texas, see Exhibit "B" attached hereto and incorporated herein for all purposes.

16.     The three heirs had already spent huge amounts on attorney fees with zero success, had no more money, had no place to turn and no real hope of recovery.

17.     After several months of investigating and negotiations, Barcroft agreed, as his consideration to the Contract, to give his time and labor, along with providing the considerable necessary funds to finance the legal battle to regain the rightful share of their father's and mother's estates for the three heirs. Barcroft agreed to immediately hire an attorney to follow through on the legal necessities. Barcroft also agreed to pay, and did pay, twenty-one (21) American Silver Dollars to the three heirs at the signing of the Contract to consummate the deal.

18.     In exchange, the three heirs agreed to sell Barcroft, and did sell Barcroft, 30% of their individual shares of everything that ever came out of either their father's or mother's estates as their consideration to the Contract.

19.     The Contract between the parties was signed under Oath on May 5, 2005, by all parties, and recorded in the public record of Denton County, Texas, on May 24, 2005, as document number 2005-61443, see Exhibit "A" attached hereto.

20.     After the signing of the Contract, Barcroft immediately hired John Skotnik, an attorney licensed to practice law in the State of Texas, and a three year long legal battle ensued to regain the portion of the estates rightfully belonging to the three heirs. The battle was successful; and, in September of 2008, an agreement was reached wherein the three heirs each received one-fourth of both their father's and mother's estates through the FSA[3]. All parties to the Contract were signers of the FSA, including Barcroft. Gibbs became Executor of his father's estate and

---

[3] Kip, the brother of the three heirs and only other heir, also received one-fourth of his father's and mother's estates under the agreement.

Administrator of the FSA. It was agreed that the FSA would be the controlling authority for both estates, and the agreement was approved by both the Denton County Statutory Probate Court and Ferchill's Court.

21.    A revocable trust, GWB Family and Friends Trust, herein also "GWB", was formed under the provisions of the Contract (see Exhibit A, page 5, Section 6) to handle all funds received from the estates by the three heirs and distribute them properly to the three heirs after Barcroft's 30% was deducted and given to him. Each party to the Contract, including Barcroft, was to receive his/her appropriate share of the assets from the estates through GWB.

22.    On June 5, 2008, Barcroft, wishing to retire, sold his interest in the Contract to a foreign corporation, RENHAW, INC., a Panama corporation, for 100 America Eagle gold coins and half of all proceeds from the Contract from that day forward, after $500,000.00 had been paid to RENHAW, INC., or its assigns, from the Contract, see Exhibit "C", a copy of a Certified Copy of the sale and transfer, attached hereto and incorporated herein for all purposes. RENHAW, INC., in turn, transferred ownership of all interest from Barcroft's side of the Contract to PENTEX FOUNDATION, its parent organization, on June 20, 2008, see Exhibit "D", attached hereto and incorporated herein for all purposes. That transfer was fully accepted by the other parties to the Contract before GWB was even established, PENTEX ROYALTY TRUST was established as the payee for Barcroft's side of the Contract from the beginning of GWB, each and every payment ever made to Barcroft's side of the Contract was made to PENTEX ROYALTY TRUST, and the process worked smoothly for approximately five (5) years until 2013 when Lee entered the picture. The $500,000.00 sum was surpassed in the first distributions from the estate in 2008, and Barcroft was due 50% of everything paid to his side of the Contract thereafter.

23.     Jim Walton, Walton's spouse, was the first trustee of GWB; and, he accepted the change of ownership from Barcroft to RENHAW, INC. to PENTEX FOUNDATION at the inception and creation of GWB; and prior to the first distribution from the estate; and, paid the distributions accordingly based on the transfers throughout his trusteeship of more than three (3) years, including after the alleged release[4] claimed by defendants Gibbs and Walton. All monies ever paid out by GWB to Barcroft's side on the Contract were paid to PENTEX ROYALTY TRUST, a domestic trust set up to receive the assets and income for PENTEX FOUNDATION and pay the required United States taxes due on the income before distribution. RENHAW, INC. was never mentioned in any fashion in any GWB memos or other written material because it was out of the picture before GWB was even formed. RENHAW, INC. was not even mentioned in the fraudulent trust documents created by Lee, and introduced into Ferchill's court as the authentic GWB Trust Document. Even the estate itself paid monies due Barcroft's side of the Contract directly to PENTEX ROYALTY TRUST prior to the first distribution, see Exhibit "E", a copy of a check to PENTEX ROYALTY TRUST before the first distribution to beneficiaries from the estate, attached hereto and incorporated herein for all purposes. The Contract was honored and performed upon by all parties, and Barcroft believed that the proper amount was

---

[4] One of Lee's contentions in the suit she filed on behalf of Gibbs and Walton was that all claims from Barcroft's side of the Contract had been released in a document signed by RENHAW, INC, in 2011. In 2011, one of the gas companies, JW Operating Company ("JW"), had found where RENHAW, INC. had owned the interests in the Contract for a short period of time (less than 30 days) back in 2008. JW refused to pay royalties unless RENHAW, INC. released any claim it might have. Jim Walton, Walton's spouse, was still trustee of GWB at that time. A deal between Jim Walton, Rickey Brantley (the estate's primary attorney), and Barcroft acting as agent for PENTEX FOUNDATION, wherein RENHAW, INC. would release anything it might have retained, with all parties knowing that it had retained nothing, to GWB in order to receive royalties otherwise being held, see Exhibit "F" attached hereto and incorporated herein for all purposes. RENHAW, INC. had transferred all of its rights to the Contract to PENTEX FOUNDATION on June 20, 2008; therefore, RENHAW, INC. had nothing to release on June 26, 2011, and the release was only to satisfy a gas company that RENHAW, INC. would not later make a claim for the royalties. Distributions to PENTEX ROYALTY TRUST continued in the exact manner and percentage as before the release.

being paid to his side of the Contract. The parties all lived in relative peace with each other for the next five (5) years until Lee inserted herself into the picture.

24.     There was a large holding of real property in the estate. It was agreed between the parties to the Contract and memorialized in the FSA that the real property would be immediately listed and sold at market value; and, that the proceeds would be distributed. Gibbs became the Executor of the estates and the Administrator of the FSA.

25.     Within the assets of the estate was a very valuable tract of real estate loosely referred to as "the home place". Its value was in the ten million dollar range, and it was the "plum" of the entire estate. It was agreed in the FSA that the real property, specifically the "home place", would be immediately listed and sold at market value; and that the proceeds would be distributed. Gibbs was appointed Executor of the estate and Administrator of the FSA. After becoming Executor, Gibbs openly expressed his refusal to sell the property known as the "home place" and distribute the proceeds, openly sating that he would not "sell the home place in 3000 years". Instead, Gibbs began using that property as his own, hunting and fishing on it, selling hunting and fishing rights to others and keeping the money for his own use, while running cattle and allowing friends to run cattle on the land without benefit to the estate; all of which Gibbs admitted in sworn testimony and open court. Gibbs maintained the property, built fences, kept others out, and generally ran the property as his own for his own gain while using estate funds for expenses; all the time refusing to even list the property for sale.

26.     A rift between the parties swiftly grew. Barcroft and Howard insisted that the Contract and the FSA be honored, the property sold and the proceeds distributed. Gibbs resisted, and Walton joined in to block any attempt by Barcroft and Howard to force the sale, stating that she

wanted to keep the land for her daughter.

27.    Early in the spring of 2013, Walton hired an attorney, Lee, in an attempt to block the forced sale of the home place. Lee's methods were to demonize Barcroft, the Contract and intent, and to build a wall between Walton and Gibbs with respect to Barcroft and Howard. Lee maintained that because it was alleged that Barcroft had taken part in writing the Contract that he was a party to, that he was guilty of *practicing law without a license*; thus, Lee claimed that the Contract was invalid. The unsupported argument was made almost ten (10) years after the Contract had been written, placing it well outside of all Statutes of Limitation; but, Lee found a willing listener in Ferchill, a judge who willingly joined in the conspiracy against Barcroft. Lee got all distributions and funds cut off to Barcroft's side of the Contract, both from the estates and from gas companies who had been paying royalties to Barcroft's side for almost five years.

28.    In the process that ensued as a direct result of Lee's interference, Barcroft was forced to re-examine all the paperwork and distributions from the estate under the Contract. At that point, it came to light that Gibbs had been stealing 50% of Barcroft's side of the Contract from the outset (first distributions) to pay attorney fees for himself, Walton and Howard. Barcroft also discovered estate property was being sold without benefit to the estate.

29.    With that knowledge in hand, Barcroft immediately notified PENTEX FOUNDATION, which, in turn, moved to revoke its share (Barcroft's side of the Contract) of the proceeds from the revocable GWB Trust under the terms of the Contract at page 4, Section 6 (Exhibit A, page 5, Section 6). Lee filed suit in Ferchill's court using Texas law to impair upon the obligations of the Contract without addressing the Contract itself. Ferchill, knowingly and willingly, ignored the Texas rules and *rule of law* from the outset of the proceedings in his court.

30.    In December of 2013, PENTEX FOUNDATION revoked its contribution to GWB, a revocable trust, and transferred all rights under the Contract to GBU Friends and Associates Trust, also a revocable trust. In February of 2016, PENTEX FOUNDATION revoked its contribution to GBU Friends and Associates Trust; and transferred all ownership and rights under the Contract back to its original owner, Albert Lynn Barcroft, in an agreed settlement of obligation. The document transferring ownership of the interests in the Contract back to Barcroft was filed in the public record in Fannin County, Texas, on March 11, 2016, as Document Number 2015-1215, copy of Certified Copy of said public record is attached hereto as Exhibit "G", and incorporated herein for all purposes.

31.    Under Texas law, if an action is filed in two different courts having jurisdiction in the same time frame, the court in which the first suit was filed obtains "dominant jurisdiction" of the subject matter; and, the second court must abate in favor of the first court[5].

32.    Ferchill took jurisdiction over the case filed by Lee in his court, such action being unlawful for three reasons: 1) because the case had nothing to do with the probate of the estates; 2) because the removal of the trustee of GWB had mandatory venue in Fannin County under Texas law; and, 3) because a case with the exact issues and almost exactly the same parties had previously been filed in Fannin County, Texas. Under Texas law, the second suit must be filed as a counterclaim to the first.

33.    Through filings in Ferchill's court by several defendants, Ferchill was put on notice from

---

[5] See **In Re Alice M. Puig**, Supreme Court of Texas, 2011, 351 S.W. 3d 301, 305, Citing **Wyatt**, 760 S.W. 2d at 248, where the Supreme Court states "when a suit may be properly filed in more than one county, the court in which the suit is first filed attains dominant jurisdiction". When the jurisdiction of a county court sitting in probate and a district court are concurrent, the issue is one of dominant jurisdiction. **Wyatt**, 760 S.W.2d at 248, (explaining that when a suit may be properly filed in more than one county, the court in which the suit is first filed attains dominant jurisdiction).

the outset of the case in his court that another case involving very nearly the exact claim and parties as the one filed in Ferchill's court had previously been filed in another county, that being Fannin County, Texas. Ferchill accepted the case anyway, took unlawful jurisdiction, and proceeded to make rulings, all outside of *rule of law.*

34.     The alleged "RENHAW, INC. release" was inappropriately filed by the County Clerk of Denton County because it was signed by officers of a foreign organization in a foreign country and notarized by foreign notaries; and, it contained no Apostille. The laws of Texas require that such a document have an "Apostille" attached from the country of origin before it can be filed in the public record of Texas. This alleged release has no Apostille attached, the alleged notaries were not verified by the government of Panama as authentic and authorized; thus, it is not valid and should not have been accepted for filing. The alleged release speaks on consideration; but, outside of the fact that PENTEX FOUNDATION owned approximately 57% of the assets of GWB at the time of its signing, no consideration was ever paid or received by PENTEX FOUNDATION or RENHAW, INC. for the release of rights to the Contract. The alleged "release" should be ruled invalid on its face because proper filing procedures were not followed; and, the authenticity of the alleged "release" is in question.  Also, there was no consideration.

35.     The entire alleged release was completed while Jim Walton was trustee of GWB, it had no effect on GWB or who GWB paid, and the trustee continued to pay the exact percentage to PENTEX ROYALTY TRUST as it did before the alleged release, and the original deal continued in place with PENNTEX ROYALTY TRUST receiving monthly payouts from GWB for the next two years.

36.     When Lee entered the picture, she claimed that PENTEX FOUNDATION had given

away all its rights to its interests in the Contract because RENHAW, INC. had released what it owned in 2008. At the point of the alleged release from RENHAW, INC., RENHAW, INC. owned nothing; and, the alleged release itself claims it is only in regards to RENHAW, INC. (see Exhibit F, page 3, last paragraph, first sentence), without the mention of PENTEX FOUNDATION, even though RENHAW, INC. had transferred all its rights over three (3) years earlier to PENTEX FOUNDATION; and, the transfer had been honored and acted upon by GWB while Walton's spouse was trustee of GWB.

37.     Lee forced Barcroft and Howard to expend huge amounts of money for legal fees with frivolous filings based on fiction and Lee's vivid imagination and lies, by using her corrupt judge of favor to make unlawful rulings outside of *rule of law*. Lee was able to corrupt the system to have her exorbitant legal fees paid out of the estate when neither the Contract nor the issue had anything to do with the estate; again, by use of her corrupt judge of favor and outside of *rule of law*. As Executor and Administrator, Gibbs was able to approve the payments, and hundreds of thousands of dollars were stolen from the estate and put in Lee's pockets as legal fees for Walton and Gibbs. The rulings by the Statutory Probate Court No. 2 of Tarrant County, Texas, are in violation of Article I, Section 10 of the Constitution, "No State shall … pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, …"

38.     For her own benefit, Lee swore out false *lis pendens* in which she claimed to have firsthand knowledge; but, which covered facts that occurred long before Lee even knew who Bert Hughes Gibbs was. Lee filed those *lis pendens* in the public record of both Denton and Wise Counties, Texas. Those *lis pendens* contain false information sworn to by Lee, all to the detriment of Barcroft, see Exhibit "H", attached hereto and incorporated herein for all purposes.

39.     Texas Rules of Civil Procedure, Rule 108a[6], gives the precise method of service required for a party in a foreign country. This rule should have been followed to serve Barcroft, because he was living in Guatemala at the time of the suit, and had been in Guatemala for over five (5) years. Lee did not attempt service in any manner prescribed by the rules; rather, Lee went to her corrupt judge of favor, Ferchill, complaining about how hard Barcroft was to serve; and, Ferchill allowed Lee to serve Barcroft by sending notice to Barcroft's wife's Facebook page, and by publication in the Fort Worth, Texas, newspapers that are not delivered in Guatemala; again, departing entirely from *rule of law* in order to aid his attorney of favor, Lee.

40.     Barcroft, living in Guatemala during these proceedings, was gravely ill during the years 2014 and 2015. Lee scheduled depositions in her suit in Ferchill's Court which were totally impossible for Barcroft to make because of his illness. Barcroft informed the court of his condition with letters from doctors, EKG's, and actual pictures of his major surgery. Barcroft turned over other discovery and stated that as soon as he could travel, he would appear for deposition. Lee pushed forward with her corrupt judge of favor, Ferchill, and got the judge to strike all of Barcroft's pleadings because Barcroft was too sick to make the over 2000 mile trip

---

[6] RULE 108a. SERVICE OF PROCESS IN FOREIGN COUNTRIES
    (1) Manner. Service of process may be effected upon a party in a foreign country if service of the citation and petition is made:
    (a) in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or
    (b) as directed by the foreign authority in response to a letter rogatory or a letter of request; or
    (c) in the manner provided by Rule 106; or
    (d) pursuant to the terms and provisions of any applicable treaty or convention; or
    (e) by diplomatic or consular officials when authorized by the United States Department of State; or
    (f) by any other means directed by the court that is not prohibited by the law of the country where service is to be made.
    The method for service of process in a foreign country must be reasonably calculated, under all of the circumstances, to give actual notice of the proceedings to the defendant in time to answer and defend. A defendant served with process under this rule shall be required to appear and answer in the same manner and time and under the same penalties as if he had been personally served with citation within this state to the full extent that he may be required to appear and answer under the Constitution of the United States or under any applicable convention or treaty in an action either in rem or in personam.

for the deposition. Barcroft agreed to be deposed by phone, but the judge negated that possibility stating, "No, if he's not here, I can't find him in contempt and throw him in jail"[7].  In a very unique ruling, Ferchill agreed to be present at Barcroft's (and other defendants') deposition in an obvious attempt to intimidate Barcroft and the other defendants, all to the benefit of his attorney of favor, Lee. In addition, the case in which Lee got Barcroft's rights under the Contract negated did not even address the Contract. Ferchill failed to operate under *rule of law* from the outset; thereby, denying Barcroft and other defendants *due process*.

41.    The legal fees in the proceeding caused PENTEX FOUNDATION to become insolvent while Lee maneuvered a way, with the help of Ferchill, to steal money from the estate to pay Gibbs' and Walton's legal fees, ranging well into the hundreds of thousands of dollars.

42.    Gibbs admitted in sworn testimony on more than one occasion that he had diverted estate funds to his own personal use. When that issue was brought before Ferchill, Ferchill made him a dependent, rather than independent, Executor. Ferchill did not remove Gibbs or punish him in any way; although, Gibbs had admitted to numerous felonies in his capacity as Executor and/or Administrator. With Ferchill as Gibbs only oversight, Gibbs could still do as he pleases; or, more correctly, what Lee pleases.

43.    Unable to continue to pay Barcroft the consideration under its agreement with him, PENTEX FOUNDATION transferred all ownership and rights under Barcroft's side of the Contract back to Barcroft in settlement of its contract with him on February 22, 2016, and filed in the Fannin County, Texas, public record on March 11, 2016, see Exhibit "G".  This suit is to

---

[7] Barcroft has never met or talked to Ferchill, and has had no communications directly with him, and has never refused to obey an order that was within his power to comply with, making the threat of incarceration unfathomable to Barcroft except as a favor to Lee to intimidate Barcroft.

force performance under the Contract of the parties who have conspired to breach the Contract in order to steal Barcroft's rightful share of the proceeds; and, to deny Barcroft *due process*.

44.     Barcroft filed a Motion to Recuse Ferchill; but, the judge refused to recuse himself, and the recusal failed because Barcroft was still too ill to make the trip from Guatemala to prosecute the motion. A short time later, another defendant, Howard, filed a federal lawsuit against Ferchill, Lee, Gibbs and Walton. Fearing oversight from a higher authority, Ferchill immediately announced that he would recuse himself.

## V.    CONCLUSION

45.     When the three heirs approached Barcroft for help in 2004, they were broke, had zero money for attorney fees, had over a one million dollar final judgment against them individually and collectively, and had lost virtually all rights to their father's and mother's estates. When Barcroft interceded, the three heirs had no hope of ever regaining their financial well-being. Through the actions of Barcroft, the three heirs were made whole financially again. Save for Barcroft's actions, the three heirs would have lost everything including their parents' estates. Now they are full heirs, and have received huge amounts of money from their father's estate.

46.     After repeatedly praising Barcroft for what he had done for them, two of the three heirs became greedy. They did not want to pay Barcroft what they had agreed to, 30% of the entire estates. Instead, they reasoned they had paid him enough. Gibbs and Walton wanted to keep a large portion of the land in the estate for themselves. Gibbs was using it, making money off the land, and not turning over the earnings to the estate. Walton sided with Gibbs to keep from selling the land and paying Barcroft's side, stating that she wanted to keep it for her daughter.

47.     To that end, in early 2013, Gibbs and Walton hired an attorney, Lee, from Alaska, that

Gibbs had met on a hunting trip there. Lee, a tax attorney by trade who had a struggling practice at best, opened an office in Fort Worth, Texas, solely to pursue this contractual matter. Realizing that the Contract was solid, Lee aided Gibbs and Walton in their conspiracy to create a method of denying Barcroft's side of the Contract its just consideration. Lee set out to disrupt the entire agreement between the parties to the Contract; and, in so doing, make herself wealthy. Since there was nothing wrong between the parties, Lee set out to make something wrong. Lee created stories out of her own fantasy, lied to the probate court, the district court, and everyone else, changed her positions and the facts regularly without cause, reason or explanation; and, was able to shut off all proceeds to Barcroft's side of the Contract by the use of fraudulent lis pendens filed in two (2) counties, see Exhibit "H", attached hereto. Lee took a release signed for the good of all parties, and interpreted it to mean that one party had given away all of its interests in the Contract. Lee, Gibbs and Walton conspired to create elaborate, but false, allegations of wrongdoing by Barcroft or his side of the Contract, all occurring many years after Barcroft had totally fulfilled his consideration to the Contract. Although her issues were totally unsubstantiated, Lee found a corrupt judge of favor, Ferchill, and filed a probate case when the issue had nothing to do with probate, carefully excluding the Contract from the judicial process. Ferchill used laws of the State of Texas, primarily probate laws and a number of laws that do not exist, to rule the Contract was unenforceable. Ferchill cut off funds to Barcroft's side of the Contract without addressing the Contract itself.

48.    Lee's first ploy was to tell Gibbs and Walton that, if either of them died, Barcroft would get their share of the Contract. Not only was that a lie, it had absolutely no basis in fact. There was nothing to even suggest such a ridiculous conclusion. Still, it worked on Gibbs and Walton because they were looking for a reason to steal Barcroft's share.

49.     Once Lee had turned Gibbs and Walton against Barcroft, the door was open to Lee. In the next twelve months, Lee created one falsehood after enough, changing her lies whenever it fit her needs.

50.     Lee enlisted the services of a favorable and corrupt judge, Patrick W. Ferchill of the Statutory Probate Court No. 2 of Tarrant County, Texas, to complete her strategy of conspiracy and theft. Ferchill signed virtually everything Lee put in front of him without regard to the law.

51.     Together, Lee and Ferchill have made a mockery out of Texas law, all to the benefit of Lee, Gibbs and Walton; and, possibly, Ferchill.  Lee's actions amount to tortious interference with a contract.

52.     Ferchill has no judicial immunity because he never obtained or had lawful jurisdiction over the matter upon which he made all of his corrupt rulings.

53.     With respect to the alleged release by RENHAW, INC., there was clearly never intention by the parties that PENTEX FOUNDATION would lose its rights under the Contract. Since Jim Walton was the trustee of GWB at the time of the alleged release, his spouse and brother-in-law, Walton and Gibbs, would have known about any agreement to decrease the PENTEX FOUNDATION share or increase their own share of holdings in GWB. The fact that nothing changed in the distribution payouts is proof that there was no intent for PENTEX FOUNDATION to forfeit its share.

54.     Without Lee, this conspiracy could not have succeeded even to the point it has. Without a willing, corrupt judge in Ferchill, the conspiracy could not have been successful to the degree it has been. Without Gibbs and Walton being willing to lie to support Lee's fraudulent allegations, the conspiracy to steal Barcroft's share of the Contract, his right to *rule of law* and *due process*

had no chance of success. Together, the conspirators, Gibbs, Walton, Lee and Ferchill, have managed to move this issue into a place it should not be; and, the defendants into a position they should not be in.

55.    Moreover, the actions of Gibbs, Walton, Lee and Ferchill in conspiracy with one another, have violated the Constitution with respect to impairing the obligations of a contract, and denied Barcroft of his unmitigated right to *rule of law* and *due process*. Those same actions also violate the laws of the State of Texas.

## VI.    CAUSE OF DAMAGES

56.    The Contract requires that Gibbs, Walton and Howard pay over to Barcroft 30% of everything they receive from either their father's or mother's estates. The three heirs complied with that agreement for the first 8 years of the Contract, with the notable exception that Gibbs was stealing half of the money due from Barcroft's side of the Contract from the outset to pay attorney fees for himself, Walton and Howard. Howard, like Barcroft, was totally unaware of the theft going on, even though he benefitted from it. It will take an accounting to determine the exact amount stolen, but the sum will be well into the hundreds of thousands of dollars, probably into the millions of dollars, all in damage to Barcroft.

57.    Gibbs and Walton have conspired with Lee and Ferchill to ensure that Barcroft's side of the Contract gets nothing, in effect regaining all of the consideration paid to Barcroft's side of the Contract. The Contract is clear in its terms. If the three heirs wish to regain their entire share of the estates including Barcroft's 30%, they must pay Barcroft five million dollars ($5,000,000.00) in one payment, in addition to any monies already paid, as liquidated damages and full settlement of their consideration, see Exhibit "A" hereto, page 43, section 4(a). Gibbs

and Walton have, in fact, effectively regained their full shares including Barcroft's 30%; therefore, they owe Barcroft Five million dollars ($5,000,000.00) as liquidated damages under the terms of the Contract.

58.     In addition, Gibbs and Walton have acted throughout the Contract in conspiracy and bad faith, knowingly stealing 50% of what was due Barcroft's side of the Contract from the outset. Barcroft has a right to collect that 50% that has already been distributed (but not to Barcroft or his side) in addition to the five million dollars ($5,000,000.00), as that amount has already been paid and stolen.

59.     In addition, Barcroft would request that the court grant punitive damages against Gibbs, Walton and Lee in an amount determined by the court to be sufficient as notice that use of bad faith and conspiracy to deprive another of its rightful dues under a contract because such actions are unacceptable and should not be tolerated by the courts.

## VII.    PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Albert Lynn Barcroft requests that the court:

a).     Issue citations to Gibbs, Walton, Lee and Ferchill to appear and answer the allegations contained herein;

b).     Upon presentation and consideration of the facts, issue a judgment in favor of Barcroft for five million dollars ($5,000,000.00) as liquidated damages and full settlement of Gibbs' and Walton's consideration under the Contract;

c).     Grant a judgment in an amount to be determined for the 50% stolen by Gibbs to

pay his own and his siblings attorney fees;

d).     Grant a judgment against Gibbs, Walton and Lee for punitive damages in an amount to be determined by the court;

e).     Issue an order to invalidate the alleged "release" that RENHAW, INC. gave in 2011 (Exhibit "F" hereto) because the requirements for signatures to file in the record under the laws of the State of Texas were not met with regards to the fact that no Apostille was attached to the foreign notaries or signatures – Texas law requires that a document notarized by a notary from a foreign country have an Apostille attached before it can be filed in the public record - thus no authentication is provided and the document should not have been accepted for filing; and,

f.)     Grant any other relief to which Plaintiff has shown himself to be entitled to.

## VIII.   CERTIFICATION AND CLOSING

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the

Clerk's Office may result in the dismissal of my case.

Dated and signed this 28th day of July, 2016.

Respectfully submitted,

Albert Lynn Barcroft, *pro se*
4344 East 1950 Road
Fort Towson, Oklahoma 74735
Phone: (903) 422-1992
E-mail: albertbarcroft@gmail.com

ORIGINAL COMPLAINT - Barcroft V. Gibbs, Walton, Lee and Ferchill